**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------------X

BRIGITTE WILLIAMS, TYLISHA STORY,
BRENDA WORTHINGTON and SHEVONNE MCKENZIE,                Docket No. 20-cv-05266

                            Plaintiffs,                 **COMPLAINT**

                   -against-

THE CITY UNIVERSITY OF NEW YORK,
BOROUGH OF MANHATTAN COMMUNITY
COLLEGE, DR. KRISTIN WATERS and "JOHN
DOES" 1-5 (fictious name used to identify unknown
individuals),

                            Defendants.

--------------------------------------------------------------------------X

Plaintiffs, **BRIGITTE WILLIAMS** ("Williams"), **TYLISHA STORY** ("Story"), **BRENDA WORTHINGTON** ("Worthington"), and **SHEVONNE MCKENZIE** ("McKenzie") (collectively with Williams, Story, and Worthington, referred to as the "Plaintiffs"), by and through their attorneys, **RICHMAN LAW FIRM PLLC** and **COBURN AND GREENBAUM PLLC**, as and for its Complaint against Defendants **THE CITY UNIVERSITY OF NEW YORK** ("CUNY"), **BOROUGH OF MANHATTAN COMMUNITY COLLEGE** ("BMCC"), **DR. KRISTIN WATERS** ("Waters"), and "**JOHN DOES**" 1-5, state and allege as follows:

### NATURE OF THE ACTION

1.      This is an action to recover damages for discrimination and harassment on the basis of, *inter alia*, race, in the terms, conditions and privileges of employment under Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §2000e, *et seq*. ("Title VII"), the New York Executive Law §290, *et seq*. ("NYSHRL"), and the Administrative Code of the City of New York §8-107, *et seq*., ("NYCHRL").   This is also an action to recover damages for Defendants' violations of 42 U.S.C. §1983.

1

## JURISDICTION

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1343(4), and 28 U.S.C. §1367.

## VENUE

3.      Venue is proper in the Southern District of New York, pursuant to 28 U.S.C. §1391, because the Southern District of New York is the judicial district in the state in which the unlawful employment practices are alleged to have been committed.

## PREREQUISITES

4.      Plaintiffs filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was accepted for filing and investigation.

5.      On or about June 16, 2020, the EEOC issued Notices of Right to Sue ("Right-to-Sue Letter") which permitted Plaintiffs to file a civil action within ninety (90) days of Plaintiffs' receipt of their individual Right-to-Sue Letters.

6.      Plaintiffs commenced this action within ninety (90) days of their respective receipts of their individual Right-to-Sue Letters.

7.      Before filing the complaint in this action, Plaintiff caused a copy of same to be served upon the Corporation Counsel of the City of New York and the New York City Commission on Human Rights.

## THE PARTIES

8.      At all relevant times, Plaintiffs were and still remain residents of the State of New York.

9.     Plaintiffs are all black.

10.     At all times material herein, Plaintiffs were "employees" entitled to protection within the meaning of Title VII, the NYSHRL, and the NYCHRL.

11.     Defendant the City University of New York ("CUNY") is the public university system of the City of New York, which is organized and existing under and by virtue of the laws of the State of New York and the City of New York to administer and maintain twenty-three (23) educational institutions including, but not limited to, Borough of Manhattan Community College ("BMCC").

12.     At all relevant times, CUNY has employed a significant number of individuals and is an "employer" within the meaning of Title VII, the NYSHRL, and the NYCHRL.

13.     Defendant BMCC is an educational institution under the umbrella and is administered and maintained by CUNY.

14.     At all relevant times, BMCC has employed a significant number of individuals and is an "employer" within the meaning of Title VII, the NYSHRL, and the NYCHRL.

15.     At all relevant times, Defendant Dr. Kristin Waters was and is still employed by CUNY and/or BMCC.   Dr. Kristin Waters is white.

16.     At all relevant times, and upon information and belief, continuing to date, Defendant Waters held the title and/or position of Director of Enrollment Management Services at BMCC and/or CUNY.

17.     Waters actually participated in, and aided and abetted, the conduct giving rise to the discrimination and harassment claims set forth herein.

18.     Upon information and belief, Waters is a resident of the State of New York.

19.     This action arises out of the Defendants' wrongful, illegal, and tortious conduct within the State of New York.

**BACKGROUND OF PLAINTIFF BRIGITTE WILLIAMS'S EMPLOYMENT**

20.     Plaintiff Williams earned a Bachelor of Arts degree in Liberal Arts in 2014 from Kentucky State University.

21.     Plaintiff Williams earned a Master of Public Administration with a Concentration in Non-Profit Organization degree in 2017 from Kentucky State University.

22.     Before commencing her employment at BMCC, Plaintiff Williams was employed as a Counselor at Kentucky State University.  Plaintiff Williams then became a Disability Adjudicator employed by the State of Kentucky.  Upon relocating to Brooklyn, New York, Ms. Williams became employed in Human Resources at the Barclays Center and as a substitute teacher at a charter school also located in Brooklyn.

23.     Plaintiff Williams commenced her employment at BMCC in February 2018 with the title of Administrative Coordinator.  As an Administrative Coordinator, Plaintiff Williams's roles and responsibilities were to supervise the call center staff, to re-implement the training and development of the staff, and to assist in the re-creation of hiring plans and documentation regarding hiring and training and development.  Plaintiff Williams was also tasked with re-creating a robust rewards and recognition program, branding of the contract center, and process improvement plans.

24.     Plaintiff Williams was then transitioned by Dr. Waters into the title of Enrollment Specialist (HEOa) in June 2018. As an Enrollment Specialist, Plaintiff Williams's roles and responsibilities significantly increased and included but were not limited to:  supervise and be in-charge of the tier 1 enrollment management services team, training and development, hiring

responsibilities, assist with college recruitment events, create rewards and recognition plans, Community services events, first contact supervisor for college students and prospective students,  payroll, assist with the implementation of protocols for the Panther Station among other things. Plaintiff Williams consistently received excellent evaluations and praise for her work at BMCC.

25.     At all times during the course of her employment at BMCC, Plaintiff Williams performed her services competently, faithfully, diligently, and in an objectively outstanding manner.

26.     In or around September 2019, Plaintiff Williams resigned from her employment at BMCC due to the harassment and the aiding and abetting of harassment by Defendants.

## BACKGROUND OF PLAINTIFF TYLISHA STORY'S EMPLOYMENT

27.     Plaintiff Story earned a Bachelor of Arts degree in American Studies and Mass Media Communications from SUNY College at Old Westbury in 2002.

28.     Plaintiff Story earned a two (2) Masters' degrees from the New School University and Baruch College in Media Studies and Higher Education Administration in 2005 and 2011, respectively.

29.     Plaintiff Story is currently studying to earn a Doctorate in Higher Education Administration.

30.     Before commencing her employment at BMCC, Plaintiff Story worked at New York University as an Administrative Assistant in the School of Galletin.  Thereafter, Plaintiff Story began employment at the City University of New York Central Office for seven (7) years as an Enrollment Management Assistant from approximately August 2008 to July 2015.

31.     Plaintiff Story commenced her employment at BMCC in July 2015 with the title of Assistant Registrar.  As the Assistant Registrar, Plaintiff Story's roles and responsibilities was that she was in charge of the registrar inbox, i.e. responding to all students, staff, and faculty members, including external stakeholders.   In addition, Plaintiff Story was in charge of processing all enrollment verifications and loan deferments and oversaw all in-person registration practices, a significant responsibility at the College.

32.     In or around September 2018, Plaintiff Story took on a new role as Assistant Director of Enrollment Management Services.  Now, Plaintiff Story's responsibilities were even greater than before, as she was now tasked with overseeing graduation, residency, transcripts, etc. from the perspective of the Registrar.

33.     Plaintiff Story has consistently received excellent evaluations and praise for her work at BMCC.

34.     At all times during the course her employment at BMCC, Plaintiff Story has performed her services competently, faithfully, diligently, and in an objectively outstanding manner.

35.     To date, Plaintiff Story is still employed at BMCC.

**BACKGROUND OF PLAINTIFF BRENDA WORTHINGTON'S EMPLOYMENT**

36.     Plaintiff Worthington earned a Bachelor of Science degree in Business Administration in 1984 from York College.

37.     Before commencing her employment at BMCC, Plaintiff Worthington, an employee of BMCC for 22 years, worked at another CUNY institution, known as City Tech, in the capacity of a college accounting assistant, then worked in the financial aid office, and then the admission office.

38.     Plaintiff Worthington commenced her employment at BMCC in 1997 with the title of Admission Counselor.   As the Admission Counselor, Plaintiff Worthington's roles and responsibilities were recruitment and processing.

39.     Thereafter, Plaintiff Worthington was promoted to Admissions Officer/Supervisor. As the Admissions Officer/Supervisor, Plaintiff Worthington's roles and responsibilities now involved the coordination of recruitment, supervising open houses, supervising staff, and generating certain reports.

40.     Plaintiff Worthington has consistently received excellent evaluations and praise for her work at BMCC.

41.     At all times during the course her employment at BMCC, Plaintiff Worthington has performed her services competently, faithfully, diligently, and in an objectively outstanding manner.

42.     To date, Plaintiff Worthington is still employed at BMCC.

**BACKGROUND OF PLAINTIFF SHEVONNE MCKENZIE'S EMPLOYMENT**

43.     Plaintiff McKenzie earned a Bachelor of Sciences degree in Social Sciences in 1997 from Binghamton University.

44.     Plaintiff McKenzie earned a Masters of Social Sciences degree in 1999 from Binghamton University.

45.     Before commencing her employment at BMCC, Plaintiff McKenzie was employed at Binghamton University in the Financial Aid Office and was the Coordinator for the Educational Opportunity Program for approximately twelve (12) years.

46.     Plaintiff McKenzie commenced her employment at BMCC in April 2010 with the title of Financial Aid Specialist.   As a Financial Aid Specialist, Plaintiff McKenzie's roles and

responsibilities were managerial in nature, namely, as the e-Services Coordinator of the new technical system being put in place at BMCC.  In addition, Plaintiff McKenzie has achieved tenured status at BMCC.

47.    Thereafter, Plaintiff McKenzie was transferred into an Enrollment Specialist role where she now is an Assistant Director of Enrollment Services.  As the Assistant Director of Enrollment Services, Plaintiff McKenzie's roles and responsibilities are customer services related, a downgrade in responsibilities from being a Financial Aid Specialist.

48.    Plaintiff McKenzie has consistently received excellent evaluations and praise for her work at BMCC.

49.    At all times during the course her employment at BMCC, Plaintiff McKenzie has performed her services competently, faithfully, diligently, and in an objectively outstanding manner.

## HOSTILE WORK ENVIRONMENT & DISPARATE TREATMENT DUE TO RACE

50.    During Plaintiffs' employment at BMCC in Enrollment Management Services, Defendants created, promoted, and maintained a pervasively hostile work environment and atmosphere.

51.    Defendants have consistently engaged in a systematic policy or practice of discrimination based upon race that predated Plaintiffs' employment at BMCC and continues unabated to date.

52.    Plaintiffs have been faced with harassment due to race of such quality that a reasonable person, in the same circumstances, would find that the conditions of his or her employment had altered.

53.     Defendants altered the terms and conditions of Plaintiffs' employment through, *inter alia*, pervasive intimidation, manipulation, ridicule, and insults.

54.     As described below, Defendants ridiculed, intimidated, and insulted black employees through systematically attempting to and/or eliminating black employees from the staff at BMCC, excluding and/or minimizing the roles of the black employees who survived elimination, subjecting black employees to frequent verbal harassment, racist language, and disparate treatment, and encouraging said negative treatment of black employees at BMCC.

55.     In addition, Defendants also encouraged, entreated, and fostered an environment which resulted in the racial harassment of Plaintiff Williams as discussed further *infra*.

56.     Plaintiffs were bullied, manipulated, intimidated, demeaned, and retaliated against by Dr. Waters and other members of the administration at BMCC.  Plaintiffs have characterized the work environment at BMCC as hostile and the actions of the administration of BMCC was pervasive.

57.     As a result of this, Plaintiffs have been forced to reconsider their jobs at BMCC and their careers at-large.  Plaintiffs have sustained anxiety, loss of sleep, depression, headaches, and exacerbation of pre-existing health conditions due to the trauma that has been caused by the Defendants.

**Discrimination and Hostile Work Environment with regards to Plaintiff Williams**

58.     During a significant portion of their employment at BMCC in Enrollment Management Services, Plaintiffs, including Plaintiff Williams and Plaintiff Worthington, were discriminated against by Defendants and were forced to endure hostile work environments which caused Plaintiffs to sustain, *inter alia*, significant emotional distress.

59.     Dr. Waters, a direct supervisor of Plaintiff Williams, used language which was racially discriminatory and demeaning and was directed at Plaintiffs, including Plaintiff Williams.

60.     More specifically, with regards to Plaintiff Williams, Dr. Waters used terms such as "ghetto" to describe black staff members and plaintiff Story.  In fact, in the presence of Plaintiff Williams, Dr. Waters told plaintiff Williams that Tylisha Story was "ghetto".  The term "ghetto" has a negative and racist connotation against black individuals.  Plaintiff Williams asked Dr. Waters if she called her ghetto behind her back as well which Dr. Waters did not deny.

61.     Dr. Waters would refer to minority women as "taking out the trash", meaning, that she would task other black individuals with terminating and/or relaying bad news to the "trash", i.e., black individuals.  The term "taking out the trash" in this context has a negative and racist connotation against black.  Even after Plaintiff Williams educated Dr. Waters in that the term "taking out the trash" as used in the context that Dr. Waters used it, was offensive and racially insensitive, Dr. Waters still continued to use said extremely offensive phrase with regards to other black co-workers.

62.     Dr. Waters has also made racially insensitive comments regarding the hair of black employees, including the Plaintiffs.  More specifically, Dr. Waters, on one occasion inquired as to whether or not Plaintiff Williams's hair was natural/real, which, of course, has nothing to do with the performance of Plaintiff Williams's job.  In fact, Dr. Waters asked other black employees whether or not their hair was theirs.  Dr. Waters's fascination with the grooming practices of black women made Plaintiffs, including Plaintiff Williams, feel extremely uncomfortable and as if they were being treated differently than other non-minority employees and co-workers.  Upon information and belief, Dr. Waters did not and has not asked white employees/colleagues whether or not their hair was naturally/really theirs.

63.    Dr. Waters questioned why black women, such as these Plaintiffs, would refer to other individuals as "Mr." or "Ms." before reciting their names.  Dr. Waters asked Plaintiff Williams among others, directly, why they would refer to other individuals as "Mr." and "Ms.".  Dr. Waters then further inquired as to whether referring to other individuals as "Mr." and "Ms." was a "southern Black thing".  Plaintiff Williams, who found this to be discriminatory, unnerving, and outside the scope of her employment, told Dr. Waters that this was done out of respect.  Dr. Waters retorted that it was a "Black thing" and that Plaintiff Williams should not address individuals in such a manner because "white people did not do that".

64.    In one specific meeting, Plaintiff Williams remembers Dr. Waters becoming aggressive, wagging her finger at Plaintiff Williams in a demeaning and disrespectful manner and threatening her that she will not sign PAF's of some CA's.  This is but one example of demeaning, disrespectful, and obnoxious behavior by Dr. Waters as against these Plaintiffs.  Dr. Waters only treated black employees in this way.

65.    Dr. Waters would generally speak negatively of black and minority individuals and classify them as "trash".  In one instance, Dr. Waters indicated she wanted to terminate Plaintiff Worthington.  To do so, Dr. Waters opined that she would have to give Plaintiff Worthington three (3) negative evaluations to get rid of her, all of which would have to be contrived by Dr. Waters.  This caused Plaintiff Williams significant fear.  For one, knowing that Plaintiff Worthington was also black and considering how Dr. Waters has spoken negatively of black individuals, Plaintiff Williams became fearful for her job in that she believed that Dr. Waters had the power terminate any individuals she did not like, even solely due to race based on contrived reasons.  Plaintiff Williams notified Compliance and HR of Dr. Water's intended actions.

66.     In or around June 2018, Plaintiff Williams was transitioned by Dr. Waters into a new managerial role within BMCC.  At the time she was transitioned into said managerial role, Plaintiff Williams was given a new job description and organizational change.  Plaintiff Williams performed this managerial role, formerly performed by a white male, under the guise that she would be given the title that corresponded to said roles and responsibilities she was now tasked with having performed.   Plaintiff Williams was sent the job description of Enrollment Specialist HEOa by Dr. Waters.  The School directory and organizational chart reflected the change to Enrollment Specialist HEOa. An announcement was also sent to the Enrollment Management Services department.  Although Plaintiff Williams had been performing that managerial role in an exemplary manner, Plaintiff Williams questioned her title and Dr. Waters laughed and stated she made a mistake "that did not need to leave her office" meaning that she forced Plaintiff Williams to continue to perform the duties of the role she was given.  Dr. Waters retaliated against plaintiff Williams for questioning her.  Said managerial title was changed and given to a white female, Roseann Ragone, and Plaintiff Williams was demoted to Enrollment Coordinator even though she was informed that she would have to continue to perform the role of an Enrollment Specialist as Ms. Ragone was not competent for the position and Ms. Ragone often verbalized that she did not have the competency to perform the Enrollment Specialist position.  Plaintiff Williams was forced to endure retaliation and harassment from her new manager and Dr. Waters.  Plaintiff Williams received no increase in compensation even though she then assumed a far more significant role at BMCC than she had prior.

67.     Plaintiff Williams was also removed from groups which of and/or related to her job function for no reason and was involuntarily placed by Dr. Waters into a group regarding "equity and inclusion" due to, as Dr. Waters stated, "what [she] had been through".  Plaintiff Williams, to

date, is perplexed as to what this means other than Dr. Waters is clearly assuming that because she is black, she must have "been through" something that would make her an appropriate placement into the group regarding "equity and inclusion", which is inherently racist.

68.     Plaintiff Williams complained to multiple supervisors regarding Dr. Waters's behaviors.  Plaintiff Williams's pleas for this abusive behavior 'fell on deaf ears.'

69.     Dr. Waters used her position to manipulate Plaintiff Williams into conversations that made her uncomfortable.  Out of the fear of retaliation, Plaintiff Williams suffered in silence as she remained traumatized by an earlier incident of sexual harassment in the workplace and she felt that she had no one to ask for help.  Ultimately, the racist, hostile, retaliatory behavior became too much to bear and she reported it to HR and the Office of Compliance.

70.     Dr. Waters frequently enjoys treating staff members like puppets and getting them to fight with each other.  Dr. Waters perpetuates her own contrived stories with the intention of causing tension and fights between her colleagues, staff members, and employees as she did with Katty Cherubin and Plaintiff Williams.  In that instance, Dr. Waters allowed Katty Cheubin to display hostile retaliatory behavior towards Plaintiff Williams leaving her no choice but to contact Compliance for help.

71.     The above behaviors and actions taken against Plaintiff Williams by the Defendants culminated in the necessity of her having to file a Formal Complaint of Discrimination.  The Formal Complaint of Discrimination was filed on or about March 11, 2019.

72.     As the behaviors and actions taken against Plaintiff Williams by the Defendants continued despite Plaintiff Williams having filed said formal complaint, Plaintiff Williams filed a Supplemental letter in conjunction with her original Formal Complaint on or about August 5, 2019.

73.     Plaintiff Williams also filed a Formal Complaint regarding Defendants' handling of her having been harassed in the workplace.

74.     Plaintiff Williams received a response to her Formal Complaint regarding having been harassed in the workplace from Odelia Levy, Esq., the Chief Diversity Officer of Defendant BMCC.

75.     The formal response indicated that "[…] OCD's investigation **substantiated** your allegations of sexual harassment.  The outcome of this investigation will be referred to the Office of Human Resources."  Defendants' response to the investigation which substantiated Plaintiff Williams's allegations of sexual harassment was woefully insufficient as Dr. Waters allowed the retaliation and hostility to continue.

76.     Plaintiff Williams also received a response, albeit nearly one (1) year after the filing of her Formal Complaint of Discrimination filed on or about March 11, 2019, from Ms. Levy.

77.     The formal response indicated that "[…] OCD's investigation **partially substantiated** the allegations of race discrimination.  Specifically, OCD's investigation substantiated that Ms. Waters referred to Tylisha Story as "ghetto", and that Ms. Waters told you that you would be responsible for "taking out the trash" in reference to the College Assistants."

78.     Notwithstanding these findings that Plaintiff Williams has been a victim of  racial discrimination in the workplace, Defendants failed to take the necessary action(s) to remedy the situations and therefore Plaintiff Williams was left with no choice but to file the instant lawsuit and to resign from her position at BMCC.

**Discrimination and Hostile Work Environment with regards to Plaintiff Story**

79.     Plaintiff Story was also targeted by Dr. Waters on account of race.

14

80.     Plaintiff Story is aware that Dr. Waters believes that she was hired to "take out the trash".  Dr. Waters associates the black individuals over whom she is a supervisor, as the "trash" that needs to be taken out.  Dr. Waters has referred to Plaintiff Story, among other black and minority colleagues/employees as "trash".

81.     In one instance, on the first day of in-person registration for the Fall 2018 term, Dr. Waters had an altercation with a black student and her mother which resulted in the public accusation by the black student and her mother that Dr. Waters was a racist.  Dr. Waters later joked that this was an example of a "race war".

82.     In or around February 2019, Plaintiff Story realized that there was tension between lab staff and the financial aid counter staff.  Wanting to bridge the gap between the aforementioned groups, Plaintiff Story advised Dr. Waters that she would be scheduling a meeting with the Associate Director.  Dr. Waters dismissed Plaintiff Story's ambitious agenda and indicated that she did not know how far Plaintiff Story would get with her, insinuating that the Associate Director Antoinette Middleton, a black individual, was not competent to handle the situation.  Dr. Waters has often expressed a belief that black and minority individuals were not capable of performing their responsibilities in their positions at BMCC.

83.     Soon thereafter, Dr. Waters expressed to Plaintiff Story and her colleagues that a few black people on Plaintiff Story's team are tenured (including Plaintiff McKenzie) and in order for her to terminate their employment with BMCC, she would have to give each of them three (3) unsatisfactory reviews.  Knowing that Dr. Waters has issues with black employees at BMCC, Plaintiff Story became concerned for her job because she is a black, tenured employee.

84.     Angelica Rodriguez De Vargas and Yesebel Lizardo, two (2) exceptional employees formerly on Plaintiff Story's team, have resigned because of the bullying, manipulating,

intimidating, demeaning, and retaliatory conduct of Dr. Waters.  Other staff members have also expressed a desire to not return to work at BMCC because of Dr. Waters's above conduct.

85.     At times, Plaintiff Story's lab staff has expressed fear in meeting with Dr. Waters for one-on-one meetings and has requested that Plaintiff Story be present during said meetings because said meetings have been described by staff members and these Plaintiffs as hostile, bullying, and mentally draining.

86.     In addition, due to Dr. Waters's egregious behavior and derogatory remarks, Plaintiff Story requested that her Associate Director be present in the weekly one-on-one meetings with Dr. Waters, however, this only lasted one month due to the Associate Director beginning her medical leave in April 2019.  Despite same, Plaintiff Story was forced to continue to meet with Dr. Waters on a weekly basis even after filing a complaint with the Office of Compliance.

87.     Dr. Waters expressed interest in cutting College Assistants' hours.  Plaintiff Story told her that the College Assistants, who are predominately people of color, heavily rely on the money they earn as College Assistants to survive.  In response, Dr. Waters indicated that she could not relate because she has not lived paycheck to paycheck since college.

88.     In fact, Dr. Waters jokingly indicated that she expected that she would be grieved and/or possibly sued due to her conduct with regards to two (2) black College Assistants.  Dr. Waters subsequently fired those two (2) black College Assistants.

89.     Dr. Waters frequently accompanies her disparaging and offensive remarks with vulgar language.  It is difficult for Dr. Waters to complete a meeting without using vulgar language.

90.     Dr. Waters frequently enjoys treating staff members like marionettes, getting them to fight with each other based upon her perpetrating her own contrived stories with the intention of causing tension and fights between her colleagues, staff members, and employees.  More

specifically, Plaintiff Story has called into an impromptu meeting with an Associate Director who indicated her belief that Dr. Waters is trying to cause friction/an argument between Plaintiff Story and said Associate Director based upon false stories fabricated by Dr. Waters.

91.     During a weekly one-on-one meeting with Dr. Waters, Plaintiff Story specifically remembers Dr. Waters using abusive and vulgar language which made Plaintiff Story feel extremely uncomfortable.

92.     Dr. Waters has, *inter alia*, called Plaintiff Story "ghetto".  "Ghetto" is a demeaning term for black people.  Plaintiff Story is not "ghetto".

93.     Dr. Waters forced Plaintiff Story to not rehire one of her College Assistants solely due to her having to return to her native country of Ghana for a few weeks to update her student visa.  This appalled Plaintiff Story because BMCC is a public institution which serves students from over 155 countries and as such, Dr. Waters clearly does not understand the culture of BMCC nor does she respect its mission and goals.

94.     Plaintiff Story was absent from work due to a medical leave.  During said time, Dr. Waters had one-on-one meetings with Plaintiff Story's subordinates addressing with them whether or not they had questions or concerns regarding Plaintiff Story's leadership at BMCC.  Of course, there were no issues with Plaintiff Story's leadership.  Dr. Waters was trying, once more, to cause in-fighting and sabotage my career at BMCC.

95.     Dr. Waters would force Plaintiff Story to take on additional obligations and tasks at work despite Plaintiff Story not receiving any additional pay for undertaking said obligations and tasks and tormenting and/or causing Plaintiff Story to sustain emotional distress.  In fact, Plaintiff Story, among the other Plaintiffs and her black colleagues were tasked with taking on responsibilities assigned to Dr. Waters because Dr. Waters did not feel performing said

responsibilities.  For example, Plaintiff Story is now tasked with having to open and prepare the lab, create manual weekly logs to monitor all lab activities for each area, i.e. Financial Aid, Admission, and Registrar, something that was not required of her in the past and tasks for which Dr. Waters was required to complete herself.

96.     Dr. Waters has frequently used Plaintiff Story and other Plaintiffs as their 'scapegoat'.  For example, at one time, there was a debate as to who caused the Enrollment Management Staff's access to the lab to be removed.  While it was clear that this was Dr. Waters' doing, she blamed Plaintiff Story and told staff members at BMCC that it was Plaintiff Story's fault.  This was not her fault, but Dr. Waters instructed that lab access was to be removed for the Enrollment Management staff because she believed that they were stealing from the lab even though that did not happen.

97.     Ultimately, the above culminated in Plaintiff Story filing a Complaint with the Office of Compliance and Diversity against Dr. Waters.

98.     On February 3, 2020, Plaintiff Story received a letter responding to the Complaint. OCD conducted an investigation regarding part of the allegations made by Plaintiff Story in her Complaint.

99.     OCD's investigation revealed that of what was investigated by OCD, the sum and substance of Plaintiff's written Complaint was "**partially substantiated**" the allegations of race discrimination.  OCD's investigations substantiated the following:

(a)     Dr. Waters referred to Plaintiff Story as "**ghetto**".

(b)     Dr. Waters told Brigitte Williams that she would be responsible for "**taking out the trash**" in reference to the College Assistants.

(c)     Dr. Waters criticized the number of Jewish holidays the College observes during a staff meeting.

100.    As a result of the aforementioned and all general complaints made herein which have of and/or regarded Dr. Waters, Plaintiff Story has been caused to sustain significant emotional distress and as a result of same, recently received a hardship transfer from Human Resources on May 11, 2020.  The above clearly demonstrates that Dr. Waters has violated Federal and New York State law in her actions with regards to Plaintiff Story.

**Discrimination and Hostile Work Environment with regards to Plaintiff Worthington**

101.    Dr. Waters's discriminatory treatment extended to Plaintiff Worthington.

102.    Dr. Waters unilaterally and for no reason, minimized Plaintiff Worthington's role and responsibilities despite Plaintiff Worthington being a stellar and exemplary employee.

103.    Plaintiff Worthington has been a faithful employee of Defendants for over 22 years.

104.    Plaintiff Worthington was "promoted" to Admissions Officer.  With this change in title, it was expected that Plaintiff Worthington would continue in her supervisory role that she held prior to the change in title.  Of note, Plaintiff Worthington did not receive any additional compensation for this "promotion".

105.    This reorganization caused Plaintiff Worthington to have a significant diminishment in her responsibilities, including, having all individuals formerly subordinate to her reassigned, effectively stripping her of her supervisory capacity.

106.    Plaintiff Worthington believes that this reassignment is a manifestation of the discrimination she has endured from Dr. Waters.

107.    Prior to the "promotion" and continuing thereafter, Plaintiff Worthington was the subject of demeaning, manipulative, obnoxious, and embarrassing comments.   Plaintiff Worthington would be repeatedly barked at by Dr. Waters for certain inconsequential behaviors such as sitting in a certain area.  Dr. Waters also shows a lack of respect for Plaintiff Worthington,

among the other Plaintiffs and black colleagues by calling them demeaning and offensive names. These behaviors were unique to Dr. Waters' conversations with black and minority employees.

108.    Plaintiff Worthington also was subject to age discrimination as her "promotion" was actually a demotion intended on causing a 22-year employee with an exemplary record to resign from her position.  Despite having received twenty (20) years of excellent evaluations and praise for her work at BMCC, Ms. Worthington was stripped of her supervisory duties, removed from her private office, and relegated to the assignment of responding to emails in a cubicle.  Ms. Worthington was then transferred to work in the Call Center and instructed to report to a HEO Assistant.  Ms. Worthington was assigned tasks, such as to hand out raffle tickets to entry level staff members, which were far different than those assigned to her in her former supervisory role.

109.    As a result of the degradation, harassment, and micro-managing Plaintiff Worthington suffered due to the Defendants' conduct, Plaintiff Worthington, after undergoing therapy, becoming physically ill along with exhibiting symptoms of insomnia and anxiety, and after feeling that she was being forced into retirement, decided to retire on or about June 15, 2020.

110.    Plaintiff Worthington made numerous complaints to supervisors regarding the aforementioned, however, due to their failure to properly handle the situation, Plaintiff Worthington was forced to file the instant suit.

**Discrimination and Hostile Work Environment with regards to Plaintiff McKenzie**

111.    Plaintiff McKenzie was and remains a victim of Defendant's racially discriminatory behavior.

112.    Plaintiff McKenzie was transferred from her role as a Higher Education Assistant (akin to middle management) where she was tasked with handling special projects and other rigorous work responsibilities to a lesser role where she was primarily a 'front line' worker whose

sole responsibility was to answer e-mails and field student concerns and complaints (akin to an entry-level position).

113.    Defendants removed Plaintiff McKenzie from her original role despite her being a stellar and exemplary employee.  Plaintiff McKenzie believes that this demotion was not logically justifiable.

114.    Similar to Plaintiff Worthington, Plaintiff McKenzie along with other black and minority employees, were effectively demoted, despite their exemplary work, because, at least in part, they are black and/or minority employees.  Plaintiffs Worthington and McKenzie and the other minority employees who were demoted had their roles replaced with some white employees who had less experience than their predecessors.

115.    Defendants have 'played favorites' with some white employees over black and minority employees which has caused all Plaintiffs, including Plaintiff McKenzie to sustain significant financial, emotional, and mental distress.

116.    Defendants used demeaning, sarcastic, and obnoxious language and tone with Plaintiff McKenzie, among the other Plaintiffs, and contrived reasons to take responsibilities away from the black and minority employees.

117.    To wit, Plaintiff McKenzie, along with her black colleagues, were described by the Vice President of Enrollment Management, Diane K. Walleser, as suffering from "Peasant Theory", a demoralizing, obnoxious, and belittling term to describe people of color.

118.    Plaintiff McKenzie made numerous complaints to supervisors regarding the aforementioned, however, due to their failure to properly handle the situation, Plaintiff McKenzie was forced to file the instant suit.

## AS AND FOR A FIRST CAUSE OF ACTION

119.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

120.    Defendants unlawfully discriminated against Plaintiffs with respect to the terms and conditions of their employment because of their race.  By reason thereof, Defendants violated Title VII.

121.    By virtue of the acts complained of herein, the hostile work environment at BMCC was sufficiently severe and pervasive to alter the terms and conditions of Plaintiff's employment and create a subjectively and objectively abusive/discriminatory work environment.  By reason thereof, CUNY violated Title VII.

122.    As a direct and proximate result of CUNY's unlawful discriminatory practices as described herein, Plaintiffs were humiliated and embarrassed within the work  atmosphere, which was brought about by virtue of the CUNY's systematic and continuous unlawful harassment and multiple discriminatory practices and acts.

123.    As a direct and proximate result of CUNY's discriminatory practices, Plaintiffs have sustained substantial damages, the amount of which is to be determined by a jury.

**AS AND FOR A SECOND CAUSE OF ACTION**

124.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

125.    By virtue of the acts complained of herein, Defendants discriminated against Plaintiffs based upon their race, in violation of the NYSHRL.

126.    By virtue of the acts complained of herein, the hostile work environment at BMCC was sufficiently severe and pervasive to alter the terms and conditions of Plaintiffs' employment

and create a subjectively and objectively abusive/discriminatory work environment. By reason thereof, Defendants violated the NYSHRL.

127.    As a direct and proximate result of Defendants' unlawful discriminatory practices as described herein, Plaintiffs were humiliated and embarrassed within the work atmosphere, which was brought about by virtue of Defendants' systematic and continuous unlawful harassment and multiple discriminatory practices and acts.

128.    As a direct and proximate result of the unlawful and discriminatory practices of Defendants, Plaintiffs have sustained substantial damages, the amount of which is to be determined by a jury.

## AS AND FOR A THIRD CAUSE OF ACTION

129.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

130.    By virtue of the acts complained of herein, Defendants discriminated against Plaintiffs based upon their race, in violation of the NYCHRL.

131.    By virtue of the acts complained of herein, the hostile work environment at BMCC was sufficiently severe and pervasive to alter the terms and conditions of Plaintiffs' employment and create a subjectively and objectively abusive/discriminatory work environment. By reason thereof, Defendants violated the NYCHRL.

132.    As a direct and proximate result of Defendants' unlawful and discriminatory practices as described herein, Plaintiffs were humiliated and embarrassed within the work atmosphere, which was brought about by virtue of Defendants' systematic and continuous unlawful harassment and multiple discriminatory practices and acts.

133.    As a direct and proximate result of Defendants' unlawful and discriminatory practices, Plaintiffs have sustained substantial damages, the amount of which is to be determined by a jury.

## AS AND FOR A FOURTH CAUSE OF ACTION

134.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

135.    CUNY retaliated against Plaintiffs in violation of Title VII.

136.    As a direct and proximate result of CUNY's retaliatory practices as described herein, Plaintiffs were humiliated and embarrassed within the work atmosphere, which was brought about by virtue of CUNY's systematic and continuous unlawful harassment and multiple discriminatory practices and acts.

137.    As a direct and proximate result of the unlawful and discriminatory practices at BMCC, Plaintiffs have sustained substantial damages, the amount of which is to be determined by a jury.

## AS AND FOR A FIFTH CAUSE OF ACTION

138.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

139.    Defendants retaliated against Plaintiffs in violation of the NYSHRL.

140.    As a direct and proximate result of Defendants' retaliatory practices as described herein, Plaintiffs was humiliated and embarrassed within the work atmosphere, which was brought about by virtue of Defendants' systematic and continuous unlawful harassment and multiple discriminatory practices and acts.

141.    As a direct and proximate result of the unlawful and discriminatory practices of Defendants' Plaintiffs have sustained substantial damages, the amount of which to be determined by a jury.

## AS AND FOR A SIXTH CAUSE OF ACTION

142.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

143.    Defendants retaliated against Plaintiffs in violation of the NYCHRL.

144.    As a direct result of Defendants' retaliatory practices as described herein, Plaintiffs were humiliated and embarrassed within the work atmosphere, which was brought about by virtue of Defendants' systematic and continuous unlawful harassment and multiple discriminatory practices and acts.

145.    As a direct and proximate result of the unlawful and discriminatory practices of Defendants, Plaintiffs have sustained substantial damages the amount of which to be determined by a jury.

## AS AND FOR A SEVENTH CAUSE OF ACTION

146.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

147.    CUNY by itself and through and with its agent Dr. Waters, all acting under color of law and in his individual capacity, carried out the aforementioned conduct of illegal discrimination against Plaintiffs on the basis of race, altering the terms and conditions of employment, and creating a pervasively hostile work environment.

148.    As described above, Dr. Waters made numerous discriminatory decisions and statements that altered the terms and conditions of Plaintiff's employment.  These discriminatory

decisions were intended to achieve the policy of eliminating black Higher Education Administrators and minimizing the authority of those black Higher Education Administrators/professional staff members who remained.

149.    Dr. Waters had policy making authority due to her high-level positions and the fact that his discriminatory decisions altering the terms and conditions of Plaintiffs' employment were not subject to review by another official or entity.

150.    By the acts and practices described above, Dr. Waters, in her individual capacity and under color of state law, discriminated against Plaintiffs in the terms and conditions of her employment on the basis of their religion, including creating a hostile work environment, thus depriving Plaintiffs of their rights under the Equal Protection Clause in violation of 42 U.S.C. §1983.

151.    Defendants' actions in depriving Plaintiffs of their Constitutional and civil rights were willful, malicious, and recklessly indifferent to Plaintiffs' federally protected rights.

152.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of 42 U.S.C. §1983, Plaintiffs have suffered and continue to suffer monetary and/or economic harm, for which they are entitled to an award of monetary damages and other relief.

153.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of 42 U.S.C. §1983, Plaintiffs were humiliated and embarrassed within the work atmosphere and suffer from physical and emotional manifestations of such humiliation and embarrassment, which were brought about through Defendants' unlawful retaliation.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

154.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs inclusive with the same force and effect as if fully set forth at length herein.

155.    CUNY by itself and through and with its agent Dr. Waters, all acting under color of law and in their individual capacity, carried out the aforementioned conduct of illegal retaliation against Plaintiffs on the basis of their protected complaints.

156.    As described above, Dr. Waters made multiple retaliatory decisions that altered the terms and conditions of Plaintiffs' employment.  These retaliatory decisions were intended to punish Plaintiffs for making their protected complaints and for the express purpose of chilling the exercise of employee rights to prevent further complaints.

157.    Dr. Waters had policy-making authority due to her high-level position and the fact that her retaliatory decisions altered the terms and conditions of Plaintiffs' employment and were not subject to review by another official or entity.

158.    By the acts and practices described above, Dr. Waters in her individual capacity and under color of state law, retaliated against Plaintiffs in the terms and conditions of their employment on the basis of their protected complaints thus depriving Plaintiffs of their rights under the Equal Protection Clause, in violation of 42 U.S.C. §1983.

159.    Defendants' actions in depriving Plaintiffs of their Constitutional and civil rights were willful, malicious, and recklessly indifferent to Plaintiffs' federally protected rights.

160.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of 42 U.S.C. §1983, Plaintiffs have suffered and continue to suffer monetary and/or economic harm, for which they are entitled to an award of monetary damages and other relief.

161.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of 42 U.S.C. §1983, Plaintiffs were humiliated and embarrassed within the work atmosphere and suffer from physical and emotional manifestations of such humiliation and embarrassment, which were brought about through Defendants' unlawful retaliation.

**WHEREFORE**, Plaintiffs **BRIGITTE WILLIAMS**, **TYLISHA STORY**, **BRENDA WORTHINGTON**, and **SHEVONNE MCKENZIE**, respectfully requests the following relief:

a. a money judgment against Defendants for their damages, including, but not limited to lost wages, lost benefits, other economic damages, shame, humiliation, embarrassment, and mental distress;

b. a promotion or, in the alternative, front pay for those Plaintiffs still employed by CUNY/BMCC;

c. a reassignment to a different direct superior than Dr. Waters and/or a different area or section of CUNY/BMCC;

d. an award of attorneys' fees;

e. punitive damages against Dr. Waters;

f. prejudgment interest and costs;

g. a declaration that the acts and practices complained of herein violated Title VII, the NYSHRL, the NYCHRL, and 42 U.S.C. §1983;

h. and such other, further, and different relief as this Court deems just and proper under the circumstances.

Dated: New York, New York
July 9, 2020

Yours, etc.,

**RICHMAN LAW FIRM PLLC**


By: **/s/ Scott B. Richman**
Scott B. Richman, Esq.
*Attorneys for Plaintiffs*
535 Fifth Avenue, 25th Floor
New York, New York 10017
Tel: (646) 854-3547
Email: srichman@richman-law-firm.com


**COBURN & GREENBAUM PLLC**


By: **/s/ Jonathan Greenbaum**
Jonathan Greenbaum, Esq.

*Attorneys for Plaintiffs*
1710 Rhode Island Avenue NW
Second Floor
Washington, D.C. 20036
Tel:     (202) 657-4490
Email: jg@coburngreenabum.com